THE CONGRESS & EMPIRE SPRING COMPANY, appellant, *v.* HIGH ROCK CONGRESS SPRING COMPANY, respondent.

The owner of a peculiar product of nature like natural mineral water, who has applied to it a conventional name, by which it has become generally known, and under which it has been extensively sold by him as a useful article, is entitled to be protected in the exclusive use of such name as his trade mark in the sale of the article.

Where the spring first known as and named " Congress Spring" produces natural mineral water of peculiar medical and curative properties, possessed by no other spring, the words " Congress Water," and " Congress Spring Water," appropriately indicate the origin and ownership of the water flowing from Congress spring, and the word " Congress" used in connection with the bottling and sale of such water, is a proper and legitimate business trade mark.

Where the plaintiffs are the purchasers of the spring and all interest of the original proprietors who invented and used such trade mark, they are entitled to relief by injunction against sellers of mineral water attempting to appropriate the word Congress as descriptive of the water sold by them.

(Argued March 22d, 1871 ; decided April 4th, 1871.)

THE appeal is from the affirmance by the late General Term of the Supreme Court, in the fourth district of the judgment of the referee, dismissing the complaint, and excluding proof of the truth of its allegations, on the ground that it did not state facts sufficient to constitute a cause of action.

The suit was brought to restrain the defendant from simulating the plaintiffs' trade marks, and to obtain an accounting for the damages resulting from their wrongful appropriation to the use of the defendant.

The complaint alleged, among other things, that the plaintiff is a corporation organized in 1865; that on the 5th of August in that year, it became the owner of the Congress Spring property in Saratoga Springs, and that the waters of that spring are medicinal and efficacious in the cure of various orders of disease.

That it is a mineral spring, which has been known and designated as *Congress Spring* ever since its discovery in 1792.

That its waters were found to have distinctive medicinal qualities, peculiar to that particular spring; and that they retained their efficacy when bottled and carried away.

That there are other mineral springs in Saratoga, but none of them were ever known by the name of Congress Spring; and the waters of no other spring possessed the same curative properties, nor were they known as Congress Water.

That in 1825, the proprietors of Congress Spring commenced the business of bottling and selling its waters under the name of Congress Water; that the business thus established has been continued ever since by the successive proprietors; that the Congress Water so bottled became an article of merchandise, and was sold to a very large extent in the commercial marts of America and Europe.

That during this entire period of more than forty years, the successive proprietors of the Congress Spring property and business, continued the *exclusive use* of the names of "Congress Spring" and "Congress Water," in reference to said spring and the waters thereof, down to the alleged invasion of such right by the defendant, shortly before the commencement of this suit in 1867.

That John Clarke owned the property, and conducted the business individually, and in conjunction with one Lynch, from 1825 to his death in 1846; that his devisees succeeded to the ownership and conducted the business until 1852; that

one White then became a part owner, and the business was conducted by him and the devisees, under the name of Clarke & White, until 1865, when the plaintiff succeeded by purchase to the ownership of the property, and has since continued the business.

That from 1825 down, Clarke and his successors in the business used, as one of its trade-marks, the words " Congress Water," with the names or initials of the successive proprietors, respectively, on the corks used in bottling the waters of Congress spring.

That during the entire period the names of the proprietors for the time being were impressed on the bottles in which the water was sold, and the empty bottles, with the successive proprietary marks, on being returned, were refilled with the water of Congress spring.

That during the whole period the successive proprietors put up the bottles for sale in boxes, on the top of each of which was inscribed, by means of a stencil plate, their trademark, " Congress Water," with the names of the proprietors for the time being of Congress spring; and on the end of each box was inscribed in like manner a statement, that the words " Congress Water" were branded on the corks of all bottles containing the genuine water.

That the plaintiff invested a large capital in the purchase of the Congress Spring property, and the necessary warehouses and apparatus for bottling the water and preparing it for market; and the business was profitable and remunerative up to the time of the alleged wrongs on the part of the defendant.

That within a few months certain parties organized the defendant's corporation, and the defendant, under the name of " High Rock Congress Spring Company," has, since its organization, commenced the preparation, for sale, of a medicinal water intended to resemble the Congress water, and the sale thereof as Congress water; that it has prepared a very large quantity thereof, and put up the same in bottles for sale, with marks and inscriptions thereon intended to deceive

the public, and to induce the belief that the bottles of water so prepared and sold by it are waters of the said Congress spring, and thereby to sell the same as Congress water; that it has opened an office for the sale of the same in the city of New York, under the charge of one Thomas J. Clark as its agent, where it is selling the same to persons who wish to purchase Congress water, as the original Congress water from Congress spring aforesaid; that among the other devices fraudulently contrived by it, thus to deceive the public, it assumed the corporate name of High Rock Congress Spring Company; uses bottles for putting up the water prepared by it of a form similar to those used by the proprietors of Congress spring, with the words " High Rock Congress Spring Water" impressed thereon ; that these words are also printed on the corks, and that like inscriptions are made with stencil plates on the tops and ends of the boxes containing the bottles.

That the defendant has prepared a very large quantity of the said mineral water for sale in the manner aforesaid, and by means of the said fraudulent devices, is now imposing upon the public large quantities of a simulated and spurious mineral water prepared by themselves, as the true waters of the Congress spring, and thereby causing an interference with the sale of the true waters of Congress spring by the plaintiff, and depriving it of its just gains on the sale thereof, which, but for the defendant's acts aforesaid, the plaintiff would realize therefrom.

Fac similes of the inscriptions used on the corks, bottles and boxes, in the sale of water by both parties are annexed to the complaint.

*John K. Porter*, for the appellant, cited *Dixon Crucible Co.* v. *Gugginheim* (2 Brewster Penn. R., 335, 339, 341); 15 New Am. Cyclopedia, 568; *Lee* v. *Haley* (Law Rep., 5 Ch. App'ls, 155); *McAndrews* v. *Bassett* (10 Jurist N. S., 556); *Smith* v. *Woodruff* (48 Barb., 438); *Dixon* v. *Fawcus* (3 Ell. & Ell., 537); *Webb* v. *Rorke* (2 Schoales & Lefroy,

666; *Sawyer* v. *Vernon* (1 Vern., 387); Laws of 1863, chap. 209; *Burnett* v. *Phalon* (9 Bosw., 192); *S. C.* (3 Keyes, 594); *Seixo* v. *Provezende* (Law Rep., 1 Ch. Appeals); *S. C.* (12 Jurist N. S., 215); *Newman* v. *Alvord* (49 Barb., 598); *Carter* v. *Carlile* (20 Beavan, 183).

*William A Beach*, for the respondent, cited Upton on Trade Marks, 86; *Amoskeag Co.* v. *Spear* (2 Sand., 599); *Fetridge* v. *Wells* (13 How., 385); *Wolf* v *Goulard* (18 id., 64); *Burgess* v. *Burgess* (17 Eng. L. & E., 257); *Stokes* v. *Landgroff* (17 Barb., 608); *Partridge* v. *Manck* (2 Sand Ch., 622); *S. C.* (2 Barb. Ch., 101); *Merrimack Manuf. Co.* v. *Garner* (2 Abb., 318).

Folger, J.   The questions involved in this appeal are two: 1st. Can the owner of a peculiar product of nature be protected in the exclusive use of a name belonging to it alone, and employed by him as his trade mark in his sale thereof? 2d. Does the name or trade mark used in the case before us by the plaintiffs, indicate the origin, ownership, or place of that product, and is it one in the exclusive use of which the plaintiffs should be protected?

The general rules of law applicable to these questions do not seem to be controverted.   All agree that a name may be used as a trade mark, when it is used as indicating the true origin or ownership of the article offered for sale; and that the owner may be protected in its exclusive use, when it is appropriated as designating the true origin or ownership of the article to which it is affixed; and when others may not use it with equal truth, and have not an equal right to employ it for the same purpose.   We do not propose to assert in this case any principle which will conflict with these rules.

The case comes before us on an appeal from a judgment sustaining the dismissal of the complaint made upon the opening of the case for the plaintiffs, with no testimony taken on either side.   In this inquiry, all of its allegations are to be taken as true.   One of them is, that the names " *Congress*

*Spring*" and "*Congress Water*," are, and from 1792 have been, used to designate a particular spring of water at Saratoga Springs, and the flow therefrom possessed of very remarkable medicinal qualities peculiar to itself. Another is, that these names have never been applied to any other spring or any other water, and that no other spring nor any other water possesses these peculiar curative qualities. The full strength of these allegations is, that here is a particular article with valuable qualities of exclusive peculiarity, of which the owners of this spring possess the only source, and which can be had only from them. Still another allegation is that this water when bottled preserves all of its qualities, and that it has from 1825 on, become an extensive article of commerce of much profit to the proprietors, and is sought for in the market by these names.

If this water was an artificial compound of worth, of such fame as to be in public demand, and its ingredients and the proportion of their admixture were the result of the study, information and skill of the owner, and known only to him, an imitation of any proper symbol by which he guaranteed to the purchaser the verity and origin of the compound, would be a violation of the rights of both. And why? For that the purchaser has a right to have the very thing which he seeks, and the owner has the right that the very thing sought shall be sold at his profit. It does not alter this right that the compound held for sale and sought for is made by nature and not by art. The owner of its sole place of production is the exclusive owner of it in the last case as in the first. And in the last case, as in the first, the buyer seeks that very thing. And both have the right that the truthful symbol or device which tells of the genuineness of its origin shall not be imitated with intent or effect to deceive. It is the peculiarity of the article, its merit which is individual and exclusive, which attracts the buyer. It is the sole power, from having sole control of the place of origin, to furnish this peculiarity, which is the advantage of the owner, and is his property of value. The trade mark adopted is the indication to the first

of where he may feed his desire, and the protection to the last that he shall keep the profit of being the one who does feed it.

It is true that in most of the cases which have been the occasion of the rules laid down on this subject, the article in question has been artificial. But it will be difficult to show a reason for any of these rules, which does not apply to the proprietorship of a unique product of nature, as well as to that of a unique product of art. If, as has been said, the origin of the right to a trade mark is in the sentiment of natural equity, that within certain limits, imposed by law for the benefit of society at large, every one should enjoy an exclusive profit in the result of his powers of invention, ingenuity or skill: that sentiment is as well invoked to protect every one in the enjoyment and profitable use of the property in a peculiar natural product which he has acquired with the avails of his industry, sagacity and enterprise. Sometimes it is said that the essence of the injury is fraud upon the owner, be he the owner who alone can make, or the owner who alone can sell, a specific article artificial. It is as much a fraud to injure the owner who has and sells a specific article, whose natural source is his alone. The court interferes to protect the plaintiff who has an exclusive right to use any particular mark or symbol in connection with the sale of some commodity. It is because it is his property for the purpose of such application. For the benefit of the vendor the application of the mark or symbol may be as well to a vendible commodity natural as to one artificial; and thus the vendor of the one equally with the vendor of the other have a right in his mark. In *The Amoskeag Manuf. Co.* v. *Spear* (in 2 Sandf. 599), it is said that "every merchant for whom goods are manufactured has an unquestionable right to distinguish the goods he sells by a peculiar mark or device." He has used his capital to buy the exclusive right to vend for his own profit the peculiar product of another's skill. He has devoted and is giving his time, energy, and sagacity to extending the sale of it, with the hope and expectation of that profit. No

reason presents itself why he is entitled to protection in the exclusive use of the symbol which designates that product of another's skill, more than one who with equal capital, energy and sagacity, has purchased the sole place of origin of a peculiar product of nature, and is engaged in the sale of it for profit. Both are so entitled.

It is held that the right of property in a trade-mark can be said to exist only, and can be tested only, by its violation. But its violation is when one adopts or imitates, and applies to an article of his manufacture, the name or mark previously used by another as a designation for his production. The wrong done is the sale by the first of his goods as and for the goods of the last. The violation and the wrong are the same, whether the commodity is one which the hand of man has made, or which nature has put into the hand of man. Certainly so, if into the hand of but one man has it been put. It is a matter of property, and the profitable use of property. If one use the name of another for the purpose of securing to himself in the disposition of property advantages which belong to that other, the fraud is complete, and the remedy ought to be complete. (*The Collins Company* v. *Cohen*, 3 Kay and Johns, 428.) It cannot make a difference, if the property comes by the purchase of its sole place of natural origin, or by the possession of the sole power of producing it by human effort And in accordance with these views are the following authorities, in which the commodity in question was a simple native product, unaltered by any process of art in the inherent quality infused by nature, which made it desirable to buy and profitable to sell. (*Seixo* v. *Provezende*, Law Rep., 1 Chy. App. 192; *Newman* v. *Alvord*, 49 Barb., 597; *Dixon Co.* v. *Guggenheim*, 2 Brewster [Penn.], 335.)

The first two cases further resemble the one before us, in that the proprietor of the commodity was the owner of the place of its product, and the name of that place was a prominent and controlling part of the trade-mark.

In *Lee* v. *Haley* (39 Law Jour. Chy. 284; S. C. Law Rep, 5 Chy. App. 155), the plaintiffs were dealers in coal, not claiming that they had an article of specific and peculiar merit, but only that by their care and attention to business, they had secured and attached a set of customers who dealt with and knew them by the business, style and address which the defendant had copied. The article dealt in was a natural product, in the general reach of all dealers, acquiring no merit from the manipulation of it by the plaintiffs; and strictly the authority in this connection goes only to the effect that the good will of a business represented by a particular style of address, may be protected from the interference of an imitation of that address. Even in that view it would be applicable to the case at hand. But we prefer to place our decision distinctly upon an affirmative answer to the first question above stated.

These names of "Congress Water" and "Congress Spring Water," have, as the complaint alleges, ever since 1825 been used and enjoyed by the proprietors of this spring in reference to it and its waters exclusive of all other persons; and upon the bottles containing the water, upon the corks of the bottles, and upon the boxes in which the bottles are packed for transportation, have the successive proprietors, from that time down, used a form but slightly varying of words and letters as proprietary marks denoting the contents thereof, and under the use of these marks traffic and sale thereof has become profitable, yielding a handsome revenue. Keeping in mind the facts established for the purposes of this case by the allegations of the complaint, that there is but one Congress spring, and but that one spring from which does flow Congress water, exclusively possessed of these peculiar curative medicinal qualities; and there can be no question but that these proprietary marks, adopted and used by the plaintiffs and their predecessors, do indicate the true origin and ownership of this water, and that they have been, and are now appropriated, as designating the true origin and ownership of the article to which they are affixed. And whatever may be the counter

allegations of the defendant's answer, and whatever it may be in their power to show upon the trial of an issue, the fact as presented to us by the complaint is, that of the numerous other mineral springs at Saratoga, none of them possess the peculiar curative properties of that owned by the plaintiffs, nor was any of them ever called by the name of Congress spring, or the waters thereof called Congress water, so that none other than the plaintiffs may use the proprietary marks adopted by them, upon any article of water but theirs with equal truth, nor has any an equal right to employ these marks. These marks designate the name of the water to which they are applied; they designate not only its general, but its peculiar distinctive and popular quality; and they designate its origin, ownership and place of product. Not merely that it comes from Saratoga, and is of a general character common to all the waters of that place, but that it has a specific and individual character and quality belonging alone to this spring, and which has its origin nowhere else.

By the application of capital, business sagacity and enterprise, this spring and its product have become extensively known and favorably received. That product is sought after and received by this name. It is not to trust to our common apprehension of things to believe that one who wishes for the medicinal water which he has used before, or heard of, as coming from the Congress spring at Saratoga, does not mean that specific water when he inquires for it by its specific name. And it is this name, the trade-mark of the plaintiffs, which is the short phrase between buyer and seller which indicates the wish to buy and the power to sell water from that origin, that place, of that ownership. This phrase, this device, is the trade-mark of the plaintiffs, and is of value to them, as thus designating at once this their own particular article of sale, and guaranteeing the verity of its origin. They have the right to be protected in its exclusive use, for under the facts as shown by complaint none other can use it with equal truth, and none other has equal right to employ it for the same purpose.

The exhibits annexed to the complaint tend to show that the defendants are using marks and inscriptions which do resemble in many respects those previously adopted by the plaintiffs and their predecessors, and which in some respect are an imitation not warranted by anything presented to us on the argument or appearing in the papers. The complaint shows the intent of the defendants to deceive the public by certain marks and inscriptions of a form similar to those of the plaintiffs, and to induce the belief by it that the article sold by the defendants is the same article sold by the plaintiffs, and that they are selling the same to persons wishing to buy it, as the original Congress water, from the Congress spring of the plaintiffs, to the damage of the plaintiffs. It is not necessary for us to examine closely the allegations. This is not a question as to the continuance of an injunction order restraining the defendants, but one whether the plaintiffs shall be allowed to make proof upon the issues raised by the pleadings. We think the allegations for the complaint sufficient for that purpose.

A motion to dismiss a complaint, for that it does not allege facts sufficient to show a cause of action, is in the nature of a demurrer *ore tenus* . And in that view we think the complaint avers sufficient facts to show a cause of action and to permit the plaintiffs to make their proofs.

It is insisted by the learned counsel for the respondents that the complaint avers no fact which shows that the appellants acquired the right to use the marks and emblems of their predecessors. The complaint avers that the appellants purchased the spring. It does not, by any distinct and special allegation, aver that they bought the business, or the good-will, or the right to use any particular marks or inscriptions, or any of the chattel property connected with or used in the business. The averment that the different proprietors have been in the habit of repurchasing the bottles from consumers of the waters and refilling them, and selling them again thus refilled, does not come up to such an allegation. But the complaint does aver that the spring was sold to the plaintiffs in 1865, and shows

what were, from that time, the marks and words with which they sold. And, for the trade-mark thus adopted, they have the right to ask protection. It avers matter which, if proven, tends to establish an interference on the part of the defendants with this trade-mark; so that, if the right to use the trade-mark of the first and intermediate proprietors and vendors of the water from this spring is not established, the plaintiffs may be able to establish such an imitation of the marks and devices which they have adopted as calls for the interference of the court. A property in trade-mark may be obtained by transfer from him who has made the primary acquisition; though it is essential that the transferee should be possessed of the right either to manufacture or sell the merchandise to which the trade-mark has been attached. (Upton on Trade-marks, 52.) And it may also pass, by operation of law, to any one who, at the same time, takes that right. (*Dixon Co.* v. *Guggenheim, supra;* and see *Brooks* v. *Gibson*, 34 Beavan, 566.)

The plaintiffs purchased of the former proprietors the spring. They took the whole property in it. They thus obtained that which was the prime value of it; the exclusive right to preserve its water in bottles, as an article of merchandise, and the exclusive right to sell it when bottled. Thus they acquired the business of their predecessors; for, the plaintiffs owning the spring, no one else could carry on the business. And, under the rules above stated, they acquired, by assignment or operation of law, the right to the trade mark before that, in use to designate the article upon which this business was carried on. (See, also, *Hall* v. *Burrows*, 10 Jur., N. S., 55.)

We are, therefore, of the opinion that the plaintiffs should have been allowed to adduce proofs in substantiation of the averments of their complaint.

It follows, that the judgment of the court below should be reversed, and a new trial granted, with costs to abide the event.

All the judges concurring, judgment reversed.